CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAY 1 5 2007

JOHN F CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

|  |  |  |  |
|---|---|---|---|
| SHERRY K. LOUGH, | ) | Case No. 5:06CV00078 | |
| | ) | | |
| *Plaintiff* | ) | REPORT AND | |
| v. | ) | RECOMMENDATION | |
| | ) | | |
| MICHAEL J ASTRUE, [1] | ) | By: | Hon. James G. Welsh |
| Commissioner of Social Security | ) | | U. S. Magistrate Judge |
| | ) | | |
| *Defendant* | ) | | |
| | ) | | |

The plaintiff, Sherry Lough, brings this action pursuant to 42 U.S.C. § 405(g) challenging the

final decision of the Commissioner of the Social Security Administration ('the agency") denying her

claim for a period of disability insurance benefits ("DIB") under Title II of the Social Security Act, as

amended ("the Act"), 42 U.S.C. §§ 416 and 423. Jurisdiction of the court is pursuant to 42 U.S.C.

405(g).


On November 16, 2006 the Commissioner's answer was filed along with a certified copy of the

administrative record  containing the evidentiary basis for the findings and conclusions set forth in the

Commissioner's final decision. By order of referral entered November 17, 2006, this case is before the

undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, and 28 U.S.C. § 405(g) he is substituted, in his official capacity, for Jo Anne N. Barnhart, the former Commissioner.

The plaintiff's Motion for Summary Judgment, filed on January 16, 2007 is deemed to be her brief addressing the reason why she believes the final decision of the Commissioner ought to be reversed. [2] No written request having been made for oral argument, [3] the Commissioner having now filed his brief in response and Motion for Summary Judgment and the undersigned having reviewed the administrative record, the following report and recommended disposition are submitted.

In her motion the plaintiff contends that the administrative law judge ("ALJ") erred in according "great weight" to a treating pain clinic physician's March 2004 opinion that she was capable of sedentary work activity. In response, the Commissioner argues the ALJ adequately and properly weighed the medical evidence, made a supportable functional capacity determination, and relied on substantial evidence in making the step-five determination that the plaintiff retained the ability perform the physical demands of a range of sedentary work. By motion, the Commissioner also seeks summary judgment in his favor.

## I.      Standard of Review

The court's review is limited to determining whether there is substantial evidence to support the

---

[2] Pursuant to paragraph 1 of the court's Standing Order No. 2005-2, the plaintiff in a Social Security case must file, within thirty a days after service of the administrative record, "a brief addressing why the Commissioner's decision is not supported by substantial evidence or why the decision otherwise should be reversed or the case remanded." In minimal compliance with the intent of this Standing Order, the plaintiff's summary judgment motion sets forth the single reason she believes the final decision of the Commissioner is legally deficient, and it references the court to parts of the administrative record she deems supportive of her position.

[3] Paragraph 2 of the court's Standing Order No. 2005-2 direct that a plaintiff's request for oral argument in a Social Security case, must be made in writing at the time his or her brief is filed.

Case 5:06-cv-00078-SGW-JGW   Document 15   Filed 05/15/07   Page 2 of 21   Pageid#: 53

Commissioner's conclusion that plaintiff failed to meet the conditions for entitlement established by the Act and applicable administrative regulations. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. *Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966).

"Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro v. Apfel*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). The administrative decision-maker's conclusions of law are, however, not subject to the same deferential view and are to be reviewed *de novo*. *Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000).

## II.     Administrative History

The record shows that plaintiff protectively filed her application for DIB on or about December 10, 2003 (R.64,65-67). In her supporting disability reports, the plaintiff alleged that her disability began on December 14, 2001 due to a number of medical problems, including degenerative disc disease,

3

chronic low back pain, arthritis in her lower and upper extremities, depression, Crohn's disease, high blood pressure, and sleep apnea. (R.76-77). Her claim was denied both initially and on reconsideration. (R.29-38,123). Pursuant to her timely request, an administrative hearing on her application was held on January 26, 2006 before an ALJ. (R.45-56,503-538). The plaintiff was represented by counsel at the administrative hearing. (R.42-44,503-538).

Utilizing the agency's standard five-step inquiry,[4] the plaintiff's claim was denied by written administrative decision on May 16, 2006. At the initial determination step, the ALJ found that the plaintiff met the Act's insured status requirements through December 31, 2007 and that there was "no evidence" she had engaged in significant work activity since her alleged onset date. (R.15).

Based on the medical evidence, at step-two the ALJ determined it established that the plaintiff's musculoskeletal condition constituted a "severe" impairment [5] within the meaning of the Act. (R.18). After expressly recognizing the plaintiff's history of Crohn's disease, mild obesity "which exacerbated

---

[4] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether, during the relevant time period, the individual engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry is a determination, based upon the medical evidence, of whether the individual has a severe impairment that has lasted or is expected to last for 12 months. 20 C.F.R. § 404.1520(c); *Barnhart v. Walton*, 535 U.S. 212 (2002). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the individual has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the individual is disabled; if not, step-four is a consideration of whether the individual's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the individual from performing other work. 20 C.F.R. § 404.1520(f).

[5] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. § 404.1520(c).

4

her musculoskeletal problems," [6] mild "controlled" sleep apnea and mild reactive depression, he concluded that none of these problems standing alone constituted a severe impairment.[7] (R.16-19). In making these findings, the ALJ grounded each on relevant portions of the plaintiff's medical treatment record. (*Id.*).

The ALJ next concluded that the plaintiff's musculoskeletal condition did not meet or equal the criteria of any listed impairment. (R.19). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. *Inter alia*, the ALJ predicated this step-three conclusion on the results of a consultive physical examination, the opinions of the state agency physicians and the plaintiff's relevant treatment records, including the March 2004 treating source assessment of Dr. Christopher Lander that the plaintiff was functionally able to do sedentary work [8] activity (R289). (R.19).

In his detailed multi-page assessment of the record, the ALJ outlined the plaintiff's treatment for a number of generally transitory medical problems by her primary care physicians, her multiple orthopedic evaluations and related conservative treatment for musculoskeletal pain and discomfort, her 2005 neurological evaluation, the absence of any alleged or demonstrated functional limitations due to obesity, the absence of any evidence to suggest that her Crohn's disease was not well-controlled

---

[6] Between June 2000 and April 2005, the plaintiff's weight increased from 226 to 247 lbs. (R.214,435).

[7] The plaintiff's appeal in this case raises no issue of any nature relating to the administrative findings which pertain either to the severity or to the functional impact of the her obesity, Crohn's disease, depression or sleep apnea.

[8] Sedentary work is defined in the agency's regulations as work involving lifting no more than ten pounds and generally require six hours of sitting in an eight-hour day and may also require a certain amount of walking and standing. *See* 20 C.F.R. § 404.1567(a).

5

pharmacologically, the absence of any other identified medical condition which adversely effected her functional abilities, her vocational profile and work history, and the vocational testimony. (R15-27). Based on this assessment of the entire medical record, the ALJ concluded that the plaintiff's residual functional capacity was less than that required to perform any of her past relevant work, but it was sufficient to permit her to engage in a range of sedentary work activity. (R.26-27).

After issuance of the ALJ's adverse decision, the plaintiff made a timely request for Appeals Council review. (R.10,502). Her request was denied (R.6-9), and the decision of the ALJ now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

## III. Facts

The record in this case shows that the plaintiff was forty-four years of age [9] at the time the administrative hearing. (R.509,529,65). She has a high school education. (R.93,141,509,529). Her past relevant employment included production work in the furniture and extruded plastics industries and also work in a plant cafeteria. (R.77-78,96-100,103,127,141,150,511,524-526,529-530).

By history, her medical records document a Crohn's disease diagnosis in 1993. (R.206). This inflammatory condition of the ileum and gastroduodenal segment was initially treated with high dose proton pump inhibitors and intermittent courses of steroids, and in July 1997 she was started on a

---

[9] Under the agency's regulations, the plaintiff is classified as a "younger worker." (R.529). 20 C.F.R. § 404.1563(a).

6

medication regime that included mercaptopurine ("6-MP") and Prilosec. (R.152,206,214). Although she experienced subsequent short-term symptom exacerbations in 2001 and 2003 (R.200,202,206-208,408), this bowel condition responded well to 6-MP medication therapy, and in the opinion of her gastroenterologist, Dr. T. Keith Vest (Harrisonburg Medical Associates), she generally "did quite well" and over time remained "quite stable." (R.152, 158,179,182,186-187,190,195,198,200,202,206-208, 211,214,434-435,440,444,447). Based on the results in 2004 of biopsies of her colon and ileum and a colonoscopy, Dr. Vest described the plaintiff's lower alimentary canal as "normal" appearing with "minimal sigmoid diverticulitis." (R.434). As the ALJ noted in his opinion, this condition neither prevented her from working nor caused her to stop working in December 2001. (R.16).

By history, the plaintiff's medical records also show that she underwent left and right carpal tunnel releases, in 1984 and 1991 respectively, and she had arthrosporic surgery in 1988 for "torn cartilage" in both knees. (R.154,345). Nothing in the medical record suggests that she experienced any subsequent carpal tunnel difficulties, and the record discloses no significant problems with her knees before the end of October 2001. (*See* R.407-413).

The records of Dr. Kerry Leichty (Rockingham Family Physicians), her primary care physician, cover the period between December 2000 to October 2005. They show that the plaintiff was primarily treated for a number of minor, transitory medical conditions, including headaches, sinus congestion and drainage, nonspecific dermatitis, a lower extremity fungal infection, recurring warts, chronic tiredness

7

and sleep apnea, [10] hypertension, allergies, minor wrist, thumb and leg injuries, a cough, and a shoulder strain. (R.378-381,385,387-388,390,396,409-412,450,454-456).

Additionally, Dr. Leichty's records show that the plaintiff, on various occasions received symptomatic treatment, beginning in Fall of 2001, for complaints of leg, back and joint pains, depression, and lethargy. (R.381,385-387,389,400-407,450,452). These primary care records also document that plaintiff's complaints of back and leg discomfort prompted Dr. Leichty's December 2002 referral of the plaintiff to Hess Orthopaedic (Dr. Glen Feltham) for an orthopaedic evaluation and his early 2003 referral of the plaintiff for a period of chiropractic treatment. (R.159,404,400).

Following a lumbar MRI (R.151), Dr. Feltham's consultive orthopaedic evaluation was done on January 11, 2002. (R.159-160). On that occasion the plaintiff presented with complaints of back pain and attendant right leg numbness beginning December 6, 2002. (R.159). Dr. Feltham, however, noted that she seemed to be "very vague about what was going on," and in his consultation report noted that the MRI showed only a "small" L4/5 disc herniation and other small disc bulges which "[did not] appear to be very significant." (*Id*.). Weight-bearing X-rays of the plaintiff's knees, however, showed "significant decreases in the joint spaces on the medial joint bilaterally with "osteophyte formation and sclerosis and condylar flattening, especially on the left." (*Id*.).

---

[10] On referral by her primary care physician the plaintiff's sleep disturbance complaints were evaluated by RMH Pulmonary Associates (Dr. William Cale) in September 2003. (R.344-348). Following a comprehensive polysomnographic study, the plaintiff was diagnosed to have a mild sleep apnea syndrome, to snore loudly, and to exhibit a significantly abnormal composition, pattern and structure of sleep. Based on these findings continuous positive airway pressure ("CPAP") therapy was initiated. (R.334-343).

8

Her left knee was, therefore, injected with DepoMedrol and Lidocaine; she was advised to loose

weight,[11] and a treatment regime consisting of physical therapy and non-steroidal anti-inflamatories was

recommended.  In the opinion of Dr. Feltham, back surgery was not orthopaedically indicated. (*Id.*).

Between January 28 and February 19, 2002 the plaintiff's back pain was treated by James Ervin,

D.C. (R215-227).  At the conclusion of these treatments, the treating chiropractor estimated that the

plaintiff had experienced an "25-30%" decrease in her low back symptoms. (R.218).

The following month, the plaintiff sought a second orthopaedic opinion from Dr. Visespong

Punyanitya. (R.162-163).  On examination, Dr. Punyanitya noted that the plaintiff appeared to be in no

acute distress, to walk with a normal gait, to be able to flex forward 90° without pain, to be able to walk

on her heels and toes, to demonstrate no sensory deficits, and to have normal circulation in her lower

extremities (R.162).  On the basis of his review of the X-rays and MRI and his clinical examination of

the plaintiff, Dr. Punyanitya concluded that the plaintiff suffered from degenerative disc disease and that

only conservative care was medically indicated. (R.163).

When next seen by Dr. Punyanitya in early May 2002, the plaintiff reported that she had been

doing "quite well" until she moved into a new house and developed an exacerbation of her low back

pain. (R.161).  Pursuant to his recommendation,  through Charlottesville Pain Management Center (Dr.

Christopher Lander) the plaintiff received an epidural steroid injection at L4/5 on May 22. (R.161,332-

333).

------------------------------------------------------------

[11] See footnote 6.

9

As part of her follow-up care by Dr. Lander, the plaintiff received an L4/5 nerve root block in August and bilateral iliolumbar ligament and sacroiliac joint injections in October of the same year. (R.315-331). When this therapy failed to resolve the plaintiff's low back pain, a lumbar discogram and a post-discogram CT were done on November 5, 2002. (R.318,313-314). Injection of the L3/4, L4/5 and L5/S1 discs during this diagnostic procedure, however, failed to show any of these intervertebral discs to be a pain generator. (R.312,314).

Nevertheless, subsequent spinal facet injections, on a as needed basis, between December 2002 and November 2005 proved to be significantly helpful in reducing the plaintiff's level of low back pain. (R.277-285,287-312,463-464,466-471). The Pain Management Center's referral of the plaintiff for two series of physical therapy sessions between May 2003 and October 2004 also provided her with significant relief and with improved back and lower extremity flexibility. (R.164-178,237-276,289).

Based on the plaintiff's positive responses to physical therapy treatment and to periodic spinal facet injections, as well as her "increasing activity level" and active pursuit of weight reduction, by March 2004 Dr. Lander concluded that the plaintiff was functionally capable of "employment at a sedentary position." (R.289).

A lumbar MRI in October 2003 (R.279) demonstrated the same early L4/5 disc herniation identified by the January 2002 MRI (R.151) and by Dr. Feltham as part of his consultive orthopaedic examination (R.159). As Dr. Lander noted at the time, "no new neurological deficits" were identified. (R.278).

Given the plaintiff's reoccurring lumbar pain complaints, Dr. Lander referred her Dr. Jeffrey Elias (UVa Arthritis Clinic) for his neurologic "evaluation and opinion regarding further diagnostic and therapeutic options." (R.468). When he saw the plaintiff on March 15, 2005, Dr. Elias found the plaintiff's strength and reflexes to be notably "excellent;" in his opinion there was "really no evidence" of significant degenerative disc disease, and he found no evidence of any lesion amenable to surgical treatment. (R.414-415,461-462,416-421).

A follow-up pelvic MRI in June 2005 also suggested no significant abnormalities and no inflamation or other disorder of the sacroiliac. (R.457-460). Likewise, neither the report of her "slight" lower extremity limitations identified at the conclusion of an additional period of physical therapy in August nor her later receipt of a single prescription for oxycodone tablets on October 9, 2005 for low back discomfort without radiating pain  suggest a disabling back condition.

As part of the administrative process, the plaintiff was referred for lumbosacral X-rays and a consultive physical examination by Dr. Chris Newell at the Virginia Department of Rehabilitative Services. (R.228-236). On examination, he found *inter alia* that the plaintiff's knees were tender, that she had relatively good lumbar flexion, and that she had full range of motion in both shoulders. (R.230,234). Based on his review of the plaintiff's medical history, his May 10, 2004 clinical examination and his associated review of the radiographic studies, Dr. Newell concluded that the plaintiff had low back pain and an inflamed sacroiliac joint. (R.230). Based on her medical history, his diagnoses of the plaintiff's medical condition additionally included Crohn's disease, facet joint arthritis and bilateral osteoarthritis. (R.229-230). Functionally, Dr. Newell assessed the plaintiff to have the

11

ability to work at a sedentary exertional level. (R.230-231).

In May 2004 and later in January 2005 as part of the agency's regular adjudication process, the plaintiff's then available medical records were also reviewed and assessed for residual functional capacity by state agency physicians. (R.364-371). In both instances the reviewing physician concluded that the plaintiff retained the functional ability to engage in work activity at a sedentary exertional level which required only occasional postural activities and required only moderate exposure to moving machinery or unprotected heights. (*Id*.).

Complaining of depressed mood due to multiple factors, including a stressed marital relationship, the recent death of her father, sibling hostility, social isolation, chronic pain, the loss of her job and her attendant financial difficulties, the plaintiff sought mental health counseling for the first time in April 2005. (R.493-501). At the time she saw Connie Richardson, a licenced professional counselor, and was assessed to exhibit, and to have exhibited over the preceding year, moderate functional mental health limitations. [12] (R.493). Over the course of approximately eighteen counseling sessions, Ms. Richardson determined that the plaintiff's symptoms ameliorated and she was able to function for significant periods

---

[12] Based on the counselor's intake evaluation, an Axis V assessment of 60, both currently and over the preceding year, was made pursuant to the Global Assessment of Functioning ("GAF") scale. (R.493). The Global Assessment of Functioning ("GAF") scale considers psychological, social and occupational functioning on a hypothetical mental health continuum of 1 to 100, with 100 to be the hypothetically highest possible score. Scores from 51 to 60 denote moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks); scores from 61-70 denote some mild symptoms (e.g. depressed mood and mild insomnia); and scores from 71 to 80 denote no more than mild symptoms that, if present, are transient and expected reactions to psycho-social stressors (e.g., difficulty concentrating after family argument). *Diagnostic and Statistical Manual of Mental Disorders*, p. 32 ("DSM-IV") (4th ed. 1994).

12

of time with mild or, at times, with only slight limitations. [13]   (R.275-292).

*Inter alia*, at the administrative hearing in January 2006 the plaintiff testified that her last job was at Ethan Allen, where she was employed from August 1993 until December 17, 2001. (R.511).  She stated than her work was in the cabinet department assembling furniture. (*Id.*).  She also testified about her past relevant production line work in the extruded plastics industry. (R.524-525).  As performed, all of the plaintiff's past relevant work was semi-skilled; the job at Ethan Allen was heavy in exertional level, and the other jobs light to medium in exertional demands. (R.511-512,524-526,529-531).

The plaintiff also testified about the onset of "really bad" knee pain in early December 2001 and about the pain "going into" her back shortly thereafter.  She stated that she was no longer able to stand and do her work at Ethan Allen, and after being off work for six months she was terminated. (R.512-515).  She outlined her medical care for the back and lower extremity pain, including principally prescription Tramadol and periodic nerve blocks. (R.515-516).  In addition, she testified about her limited abilities to perform routine household chores (R.517-519), and her other medical problems, including tendinitis, arthritis, sleep apnea, chronic fatigue, and depression. (R.520-523).

As an initial hypothetical question, the vocational witness was asked by the ALJ to assume an individual of the plaintiff's age, education and work experience, to assume an individual with a functional ability to do sedentary work (an ability to lift or carry ten pounds occasionally and less than

---

[13] On 4/14, 4/21, 6/07, 7/7, 8/11, 8/25, 9/15, and 10/27/2005 functional status/GAF scale assessments of 65 were made; on 5/10, 6/10, 6/23, 7/14, 7/28 and 12/08/2005 the scaled assessments were 70; and on 5/15, 5/23, 6/30, and 7/21/2005 the scaled assessments were  75. (R.475-492).  *See also* preceding footnote.

ten pounds regularly, an ability to stand or walk at least two hours during an 8-hour work day, an ability to sit about six hours during an 8-hour work day and an ability to push or pull), and further to assume an individual with the ability to engage in postural activities only occasionally. (R.530-531). Such an individual, in the opinion of the vocational witness, would be able to work at a "wide range" of sedentary jobs, including representative examples such as a cashier or telemarketer. (R.531-532).

Asked next to assume the same limitations and additionally to assume the flexibility of sitting or standing, [14] Dr. Gerald Wells, the vocational witness, testified that each of the representative jobs he previously identified could be performed with this option. (R.532-533,536-537). Pursuant to a third hypothetical question which added stooping, crouching and more than minimal bending as additional limitations, Dr. Wells opined that such an individual would be able to do work of the type he previously identified. (R.533-535). In response to a follow-up question by plaintiff's counsel, Dr. Wells opined that the work he identified could not be performed by an individual with the need to "lie down six times a day" as the plaintiff had indicated in her testimony. (R.536).

IV.     Analysis

Fairly summarized, the plaintiff's argument is that the ALJ based his non-disability decision on an inappropriately heavy reliance on a March 2004 functional assessment by Dr. Lander, her treating pain management anesthesiologist. Giving Dr. Lander's opinion "great weight" as part of the step-five

---

[14] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or "sit/stand limitation." *See Gibson v. Heckler*, 762 F.2d 1516, 1518(11th Cir. 1985).

assessment of her functional capacity, the plaintiff argues necessarily resulted in the ALJ's failure to consider both significant medical evidence and important parts of her hearing testimony.

The medical evidence which she contends the ALJ filed to consider adequately, are identified as portions of her hearing testimony and four discrete entries in her medical records. These include three office record entries by Dr Lander and one by the consulting neurologist. The first, dated in October 2004, records Dr. Lander's impression that the plaintiff "appear[ed] to be evidenc[ing] new radicular symptoms and signs." (R.281). The second, dated in November 2004, notes that the "most notable lesion" identified in the October 2004 repeat MRI was a left intraforaminal herniated disc at L4/5. (R.280). The third is Dr. Lander's January 2005 note to the file that he had referred the plaintiff to Dr. Jeffrey Elias for a neurological consultation. (R.468). The fourth medical entry which is claimed by the plaintiff to have been inadequately considered by the ALJ is Dr. Elias' finding that the plaintiff exhibited some disc space narrowing at L4/5. (R.414,461). Additionally, the plaintiff argues that the ALJ ignored her testimony concerning the degree to which her chronic pain restricts her daily activities and the financial constraints which limit her ability to continue pain management treatment. (R.515-516,521).

This argument is absolutely without merit. It intentionally disregards the ALJ's proper application of the treating physician rule.[15] It intentionally disregards the limited judicial review

---

[15] Under 20 C.F.R. § 404.1527 the opinion of a treating physician is entitled to more weight than the opinion of a non-treating physician, and it is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."

15

permitted by 42 U.S.C. § 405(g).[16]  It bluntly asks the court to re-weigh the evidence in contravention of settled controlling authority.  It is predicated on a fundamental misreading of the medical evidence, and it plainly seeks an outcome that is contrary to the greater weight of the evidence.

## I.

Although the "treating physician rule" is not absolute, it generally requires the trier of fact to give greater deference to the expert judgment of a physician who has treated the plaintiff and observed her medical condition over a prolonged period of time.  *Elliott v. Sara Lee Corp.*, 190 F.3$^d$ 601, 607 (4th Cir. 1999).  On the other hand, "if it is not consistent with other substantial evidence, it should be accorded significantly less weight."  *Craig v. Chater*, 76 f.3$^d$ 585, 590 (4th Cir. 1996).

The evidence cited by the plaintiff as her justification for a rejection or significant discount of the treating anesthesiologist's opinion is simply not inconsistent either with his clinical records or his assessment of the plaintiff's functional abilities.  Likewise, it is fully consistent with other treating sources and examining source records, and it is consistent with the opinions of the state agency physicians.

Contrary to the plaintiff's argument, it is consistent with Dr. Lander's 2005 neurologic referral and with the Dr. Elias' subsequent finding that the plaintiff exhibited some disc space narrowing at L4/5.  Similarly, it is fully consistent with Dr. Lander's October 2004 clinical impression concerning the plaintiff's pain complaints and his subsequent identification of an L4/5 "lesion" in the repeat (and

---

[16] In pertinent part, 42 U.S.C. § 405(g) states, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."

16

essentially unchanged) 2004 MRI. The plaintiff's reliance on her own testimony is also misplaced. There is simply nothing in the medical records to suggest that she has failed to receive any necessary pain management treatment or that it is medically necessary, or appropriate, for her to lie down during the day. In fact her testimony stands in stark contrast to her medical records.

Accordingly, in the opinion of the undersigned, the ALJ properly applied the treating physician rule in this case. Dr. Lander's functional assessment was fully supported by the record, and it was correctly given significant decisional weight.

## II.

Reviewed pursuant to the "substantial evidence" standard mandated by 20 U.S.C. § 405(g) , the record, likewise, is more than sufficient to support the ALJ's conclusion that through the decision date the plaintiff retains the ability to perform the demands of a significant range of sedentary work. *See Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990). This standard of review requires the court to make a considered review the whole record. *Hanes v. Celebrezze*, 337 F.2$^d$ 209, 214 (4th Cir. 1964). It does not permit, as the plaintiff's argument suggests, a selective reading of the record.

"Substantiality of the evidence *must be based upon the record taken as a whole*. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler,* 745 F.2$^d$ 383, 388 (6th Cir. 1984) (internal quotation marks and citations omitted) (emphasis added). Therefore, a reviewing court "*must* affirm" an ALJ's decision if, "*in light of the whole record*," the decision is supported by evidence of "sufficient quality and quantity 'as a reasonable mind might

17

accept as adequate to support the finding under review.'" *Piney Mountain Coal Co. v Mays*, 176 F.3[d] 753, 756 (4th Cir. 1999) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)) (emphasis added).

In the case now before the court, there is manifestly substantial evidence supporting the ALJ's non-disability conclusion. For example, the results of multiple straight leg raising in 2001 and 2002 were negative, and as the Commission notes in his brief [17] these findings constitute an important indicator that the plaintiff's lumbar pain was not due to nerve root pressure produced by a herniated disc. (R.161,162,401-402,404). Similarly, the failure of a November 2002 discogram to recreate or reproduce the plaintiff's pain strongly suggests that her pain was not discogenic in origin. (R.312-314). The ALJ's conclusion is also strongly supported by the consistent findings of both treating and consulting physicians. Between January 2002 and March 2005, Drs. Feltham (R.159,151), Punyanitya (R.163), Newell (R.230-235) and Elias (R,414,461) separately identified nothing to suggest that the plaintiff suffered from disabling degenerative lumbar disc disease.

### III.

At its core, the plaintiff's argument is nothing more than an appeal for the court to re-weigh the evidence and to substitute its judgment for that of the agency. Such is not the court's role. *Hays v. Sullivan,* 907 F.2 [d] 1453, 1456 (4th Cir. 1990). It was the ALJ's duty make the necessary findings of fact and to resolve conflicts in the evidence. *Id.* Necessarily, therefore, the core question in this case

---

[17] Citing Anderson, G.B.J. and McNeil, T.W., *Lumbar Spine Syndromes: Evaluation and Treatment* pp.77-78 (Springer, 1989), the Commissioner notes that the straight leg raising test is designed to detect lumbar nerve root pressure, tension or irritation and that a positive straight leg is the single most important clinical sign of nerve root pressure caused by disc herniation,

Case 5:06-cv-00078-SGW-JGW    Document 15    Filed 05/15/07    Page 18 of 21    Pageid#: 69

is not whether the plaintiff might be in fact disabled, but whether the ALJ's finding that the plaintiff is not disabled is supported by substantial evidence. *Craig v. Chater,* 76 F.3$^d$ 585, 589 (4th Cir. 1996).

Having determined that the ALJ made functional capacity and credibility determinations which are supported by the record and reached pursuant to a proper analysis, it is not proper for this court to go beyond the ALJ's stated reasons, re-weigh the evidence, or to consider other possibilities which might, or might not be, supported by the record. *Mastro v. Apfel,* 270 F.3$^d$ 171, 176 (4th Cir. 2001).

## IV.

As previously noted, the plaintiff in this case predicates her appeal on a single issue related to the ALJ's step-five finding that she retained, through the date of his decision, the functional ability to engage in a range of sedentary work activity. This was the opinion of Dr. Lander, her treating anesthesiologist. (R289). This was the view of Dr. Newell after his consultive examination. (R230-235). This was the opinion of two state agency physicians. (R.364-371). And it was a view which is uncontradicted by the records on the other treating or examining source.

In short, the ALJ's non-disability conclusion in this case rests on the greater weight of the evidence. It has an evidentiary basis which is far more than would be minimally necessary to be affirmed, and this court has no licence to disturb it. *See Piney Mt. Coal Co. v. Mays,* 176 F.3$^d$ 753, 756 (4th Cir. 1999) (where the administrative decision "rest[s] within the realm of rationality," the court has no license to disturb it); *Doss v. Director, OWCP,* 53 F.3$^d$ 654, 659 (4th Cir. 1995).

## V.    Proposed Findings of Fact

19

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. The Commissioner's final decision considered adequately all of the evidence in this case;

2. The record contains substantial evidence that the plaintiff is not disabled;

3. The ALJ properly applied the "treating physician rule;"

4. The record contains substantial evidence that the plaintiff, through the date of the ALJ's decision, was functionally able to engage in a range of sedentary work activity;

5. The Commissioner's final decision is supported by substantial evidence; and

6. Through the date of the ALJ's decision, the plaintiff was not disabled within the meaning of the Social Security Act.

**VI.  Recommended Disposition**

For the foregoing reasons, it is RECOMMENDED that a final order be entered DENYING the plaintiff's motion for summary judgment, GRANTING the defendant's motion for summary judgment, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge.

**VII.  Notice to the Parties**

20

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

The clerk is directed to transmit copy of this Report and Recommendation to all counsel of record.

DATED: 14th day of May 2007.

United States Magistrate Judge

21